UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Cranshire Capital Master Fund, Ltd.,

    Plaintiff,

v.

Advanced Cell Technology, Inc.,

    Defendant.

Docket No. 11 CV 8755 (DLC)(JCF)

---

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

Philip H. Cohen
**GREENBERG TRAURIG LLP**
200 Park Avenue
New York, N.Y. 10166
(212) 801-9200
cohenp@gtlaw.com

Scott Mendeloff (*pro hac* application pending)
Gabriel Aizenberg (*pro hac* application pending)
**GREENBERG TRAURIG LLP**
77 West Wacker Drive, Suite 3100
Chicago, IL 60601

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

    I. Cranshire Fund has Established a Clear or Substantial Likelihood of Success on The Merits ............................................................................................. 2

        A. The JMJ Transaction Unquestionably Triggered the Anti-Dilution and Notification Provisions in the Warrants ........................................... 2

        B. Cranshire Fund Knows the Exact Number of Shares that It is Entitled to Receive: 18,662,107 ............................................................................. 4

    II. Cranshire Fund Will Suffer Irreparable Harm If A PI Is Not Granted ................ 5

        A. Cranshire Fund Has Not Unduly Delayed In Seeking Injunctive Relief . 5

        B. The Parties Contractually Agreed That Money Damages Will Not Adequately Compensate Cranshire Fund For Any Loss Incurred By Reason Of ACTI's Breach Of The Warrants ............................................ 7

        C. Because ACTI Is In A Perilous Financial State, ACTI Is Unlikely To Be Able To Satisfy Any Ultimate Damage Award ................................. 8

    III.   The Balance Of Hardships Clearly Weighs In Favor Of Cranshire Fund ....... 9

    IV.   Cranshire Fund Should Not Be Required To Post A Bond ............................ 9

CONCLUSION ................................................................................................................ 10

Plaintiff Cranshire Capital Master Fund, Ltd. ("Cranshire") submits this reply in support of its motion under Fed. R. Civ. P. 65 for a preliminary injunction ("PI") against defendant Advanced Cell Technology, Inc. ("ACTI").

## INTRODUCTION

ACTI's response to Cranshire's PI motion effectively concedes that Cranshire has a clear and substantial likelihood of success on the merits. ACTI states that it is willing to deliver to Cranshire "its shares" (but only as part of a global settlement) (ACTI Br. at 10), and devotes only two paragraphs re-hashing arguments that Judges Crotty and Engelmayer already rejected. (*Id.* at 15-16) Instead, ACTI primarily focuses upon arguing that Cranshire cannot establish irreparable harm. First, ACTI argues that Cranshire unduly delayed in seeking a PI. The law is clear, however, that the time Cranshire took to file its PI Motion is insufficient to defeat a finding of irreparable harm because: (a) the time period was not "substantial" -- just 2 ½ months after Alpha Capital filed its suit, and 1½ months after Judge Crotty ruled that Alpha Capital's suit had merit; and (b) ACTI has shown no prejudice. Second, contrary to ACTI's contention, the law in this Circuit is clear that in assessing irreparable harm, ACTI's contractual admission that money damages will not adequately compensate Cranshire for ACTI's breach is strong evidence to support a finding that an award of money damages is inadequate. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2nd Cir. 1999) (finding a contractual provision acknowledging that irreparable harm will result from a breach "might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm" if there is a breach). Third, ACTI's attempt to morph the facts establishing its perilous financial state into a picture of financial health also suffers from consideration of only selective facts. ACTI is a start-up company with no revenues and profits, a substantial negative net worth, runs on a monthly deficit, and relies

1

solely upon investor funds infusions to run its operations. Thus, as Judges Crotty and Engelmayer found, there is substantial risk here that ACTI will be unable to satisfy any money damages award absent immediate injunctive relief. Fourth, ACTI's response does not dispute Cranshire's position that money damages will not make it whole because compelling compliance rather than simply awarding damages reinforces the sanctity the bargains between ACTI and Cranshire.

## ARGUMENT

I. **Cranshire has Established a Clear or Substantial Likelihood of Success on the Merits.**

   A. **The JMJ Transaction Unquestionably Triggered the Anti-Dilution and Notification Provisions in the Warrants.**

ACTI argues that Cranshire does not satisfy the "clear or substantial likelihood of success" prong as to the merits of its breach of contract claim because the JMJ transactions did not cause ACTI to "issue[] any common stock for a consideration of less that $0.10 per share" and thus did not trigger the anti-dilution and notice provisions in the Warrants. (ACTI Br. at 15-16) ACTI arrives at this argument by selectively considering only a portion of the operative language of the JMJ notes, only a portion of its letter agreement with JMJ and by ignoring the key language in the anti-dilution provision of the Cranshire Warrants. The JMJ notes provide that JMJ could convert all or part of the Notes into shares of ACTI's common stock at the conversion price equal to **the lesser of**: (a) $0.10 per share, or (b) 85% of the average of the three lowest trade prices in the 20 trading days prior to the conversion. (Exs. O-P; 11/7/11 Rabin Decl. ¶ 6) Furthermore, in a letter agreement between ACTI and JMJ agreed: "as long as it remains practical, [JMJ] will continue to convert at $0.10 per share, as long as the Borrower [ACTI] continues to make whole on any loss on conversion (the "Conversion Loss") at $0.10

2

that should have occurred below $0.10 per share." (11/7/11 Rabin Decl. ¶ 7, Ex. A) ACTI ignores entirely the language: "...as long as the Borrower [ACTI] continues to make whole on any loss on conversion (the "Conversion Loss") at $0.10 that should have occurred below $0.10 per share." Per this language, the JMJ notes provide that when conversions should have occurred below $0.10 per share, ACTI will convert at $0.10 but make JMJ whole by increasing the value of JMJ's notes by the value of the difference between $0.10 per share and the actual conversion price, that is, 85% of the average of the three lowest trade prices in the 20 trading days prior to the conversion.

ACTI also ignores that § 3(b) of the Warrants is triggered not by a nominal price, but rather the "effective price" at which its shares were offered or issued:

> If [ACTI] at any time while this Warrant is outstanding, ***shall offer, sell, grant any option to purchase or offer, sell or grant any right to reprice its securities, or otherwise dispose of or issue*** (or announce any offer, sale, grant or any option to purchase or other disposition) ***any Common Stock or Common Stock Equivalents entitling any Person to acquire shares of Common Stock, at an effective price per share less than the then Exercise Price*** .... (Emphasis supplied).

Thus, if ACTI issues shares or entitles someone to obtain shares at an "effective price" lower than the Exercise Price, then the Exercise Price is automatically lowered under § 3(b). Here, ACTI strives to read out the word "effective".[1] ACTI's interrogatory response conclusively establishes that the effective exercise price for the JMJ conversions was $0.027045 per share, because it shows that JMJ paid $500,000 for Note A and received 18,487,395 shares of ACTI's common stock under it; this results in an effective price per share of $0.027045 ($500,000/18,487,395 shares). (12/13/11 Kopin Decl. ¶ 11) Thus, the transaction triggered the

---

[1] *See R/S Associates v. New York Job Dev. Auth.*, 98 N.Y.2d 29, 32 (N.Y. App. Div. 2002) ("effective cost of funds" in a loan agreement means the "actual cost of securing such funds for a specific loan"; a contrary reading "ignore[s] the import of 'effective' in modifying the term "cost of funds").

3

anti-dilution provision (§ 3(b)) and the notice provisions (§§ 3(b) and 3(g)(i)) -- neither of which ACTI complied with before Cranshire's Warrants were exercised on December 22, 2010. Before Judge Engelmayer, ACTI admitted that the JMJ issuances were at $0.10 was a "technical argument" and that the plaintiff-investor's $0.03 per share calculation was "right". (Cohen Decl., Ex. 3, Hearing Tr. at 18)  Judge Engelmayer found that "the effect of the [JMJ] issuances was to reduce the conversion price applicable to" the plaintiff-investor. (*Id.*, at 32)  Likewise, Judge Crotty held ACTI's position here "is not based on reality", finding that "the conversion price of $0.10 on JMJ's notes was merely nominal; and that the true price was in fact less that $0.10." (*Id.*, Ex. 2, p. 6)

### B.   Cranshire Knows the Exact Number of Shares that It is Entitled to Receive: 18,662,107.

ACTI also argues that Cranshire cannot establish a likelihood of success because Cranshire's opening papers do not specify the exact number of shares sought, and merely seek "at least" 12,680,094 shares. (ACTI Br. at 16)  Cranshire's statement resulted directly from ACTI's failure to comply with its contractual obligation to notify Cranshire of the full effect of the JMJ transaction.[2] (Cranshire Br. at 1)  Cranshire issued its interrogatory to obtain this missing information. Having received ACTI's interrogatory response, Cranshire was able to determine the exact number of shares to which it is entitled as a result of the JMJ dilutive issuance. As noted, the "effective price" of the JMJ transaction was $0.027045 per share, which lowered the Exercise Price of the Warrants to this price.[3]  On December 22, 2010, Cranshire

---

[2] Cranshire was left to base its demand upon the best information available at the time it filed suit -- the rulings of Judges Crotty and Engelmayer.

[3] On December 11, 2011, Cranshire emailed ACTI a second Declaration of Mitchell P. Kopin, which based upon ACTI's interrogatory response and other public filings of ACTI sets forth Cranshire's calculation of the "effective price" of the JMJ transaction. ACTI's objection to this submission (ACTI Br. at 1, n.1) should be overruled because: (a) in conference with the court on December 4, 2011 and in its opening brief, Cranshire specifically stated that it needed ACTI's interrogatory response in order to

4

exercised the Warrants in full and paid the maximum aggregate exercise price of $691,819.34. (12/1/11 Kopin Decl. ¶ 16) Although the Warrants entitled Cranshire to purchase 6,918,197 warrant shares, Cranshire paid the aggregate exercise price via a cashless exercise under which ACTI withheld 2,709,830 Warrant Shares and delivered 4,208,368 Warrant Shares . (12/1/11 Kopin Decl. ¶¶ 16, 25) At a $0.027045 per share exercise price, however, the total number of Warrant Shares issuable upon exercise in full of the Warrants for this maximum aggregate exercise price was 25,580,305 ($691,819.34/$0.027045 effective price). (12/1/11 M. Kopin Decl. ¶ 24; 12/13/11 M. Kopin Decl. ¶ 14). Accordingly, had ACTI upheld its contractual obligations, it should have delivered to Cranshire 22,870,475 Warrant Shares (25,580,305 shares-2,709,830 shares so withheld). Reducing this by the amount of Warrant Shares ACTI did deliver to Cranshire in December 2010, ACTI still owes Cranshire 18,662,107 Warrant Shares (22,870,475-4,208,368).

## II.     Cranshire Will Suffer Irreparable Harm If A PI Is Not Granted.

### A.     Cranshire Has Not Unduly Delayed In Seeking Injunctive Relief.

ACTI argues that Cranshire cannot establish irreparable harm because it unduly delayed in seeking a PI. ACTI claims it disclosed the JMJ financings in March 2011,[4] and that Cranshire has been aware of the suits that other investors have brought against ACTI. (ACTI Br. at 8-10) This argument should be rejected.

---

calculate the exact amount of shares to which it is entitled (PI Brief at 1); (b) this Court's briefing schedule does not bar the submission of additional proof; and (c) ACTI has not been prejudiced -- ACTI received the Declaration with sufficient time to evaluate it and it is based primarily upon ACTI's own public filings. In addition, mid-day on December 12, 2011, Cranshire informed ACTI that it would not object to ACTI having additional time to file a response to the calculations in the Declaration, so long as Cranshire would receive the emailed response by 11 am EST on December 13, 2011. ACTI did not email any response.

[4] ACTI's March 2011 disclosure of the JMJ transaction did not disclose sufficient information to determine the "effective price" of JMJ conversion, including the dates of the conversions, the instruments converted, and the amount of shares issued.  Cranshire obtained this information upon receipt on December 9, 2011 of ACTI's interrogatory response.

5

"Most of the caselaw on [the delay] issue involves trademark and copyright disputes… [where] it appeared indisputable that the trademark or copyright owners were well aware of their rights…had concluded they were not violated" but then later brought suit because of the strength of commercial competition. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27,39 (2nd Cir. 1995). This is not an infringement case. Due to ACTI's non-disclosure, ACTI was not aware until the filing of the *Alpha* action that ACTI had breached the warrants. Furthermore, typically, in cases where courts find undue delay, "the defendant had taken costly steps during the period of delay that would be at least temporarily undone by injunctive relief." *Tom Doherty*, 60 F.3d at 39. ACTI does not contend that it has taken any steps -- costly or otherwise -- during the alleged delay period that would be undone by granting the requested injunctive relief.

Moreover, the alleged delay here has not been "significant". *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("**[s]ignificant** delay in applying for preliminary injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm") (emphasis added). Cranshire filed suit and its PI motion just 2 ½ months after it became aware of the potentially dilutive effect of the JMJ transaction, *i.e.*, after Alpha Capital filed suit on September 16, 2011, and just 1 ½ months after Judge Crotty issued his October 14, 2011 PI order. Thereafter, Cranshire unsuccessfully sought to intervene in Judge Crotty's case. This time period well within the permissible parameters established by courts in this Circuit,[5] as well as the parameters of the Second Circuit cases ACTI cites pp. 9-10 of its brief.[6]

---

[5] *See, e.g., Tom Doherty*, 60 F.3d at 39 (5-month delay insufficient to defeat finding of irreparable harm); *Mastercard Intern. Inc. v. Sprint Communications Co. L.P.*, 1994 WL 97097, at * 4 (S.D.N.Y. March 23, 1994) (6-month delay).

[6] *See, e.g., Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (9-month delay); *Tough Traveler Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (9-month delay in bringing suit; 4-month delay thereafter in seeking a PI).

6

Cranshire now requires immediate injunctive relief for three primary reasons. First, due to the orders of Judges Crotty and Engelmayer that ACTI deliver substantial shares to the plaintiff-investors, it is clear that if Cranshire does not obtain the requested PI, ACTI will no longer have sufficient authorized and unissued shares to deliver to Cranshire because another holder of ACTI warrants seeks more than the number of currently available authorized shares. ACTI only has 44,326,395 authorized and unissued shares, while another plaintiff investor (CAMOFI Funds) seeks 130,795,594 shares.[7] (ACTI Br. at 5, 13-14)

Second, there is no certainty whatsoever that ACTI shareholders will approve any amendment to its articles of incorporation to increase ACTI's authorized shares of common stock (the "Amendment"). If ACTI's shareholders do not approve the Amendment, it is likely that there will be a flood of lawsuits against ACTI, which ACTI states will decimate the company. (ACTI Br. at 17). ACTI also states in its proxy statement filed with the SEC on December 12, 2012, if the Amendment is not approved that ACTI may not be able to raise additional financing which is needed to fund our on-going clinical and research programs and ACTI may in the future be required to file for bankruptcy protection. (12/13/11 Cohen Decl., Ex. A) All of the foregoing will severely depress ACTI's stock price and thus the value of the ACTI shares that Cranshire now seeks.

Third, if ACTI's shareholders do actually approve the Amendment, it will result in the issuance of at least 240.5 million shares of ACTI's common stock under the settlement agreements alone (which would be an approximate 14% immediate increase in ACTI's public

---

[7] Thus, ACTI argument that compliance with a PI would be impracticable is wrong. (ACTI Br. at 13-14) Right now, ACTI has sufficient shares of its common stock to deliver to Cranshire -- 44,326,395 authorized shares. Plus, ACTI has a contractual obligation under § 5 of the Warrants.

7

float)[8] and sales of all those shares will severely depress the price of ACTI's stock and the value of the shares to which Cranshire is entitled. As ACTI admits in its most-recent 10-K, the issuance or sale of "a substantial number of shares of our common stock in the public market could adversely affect the market price for our common stock and make it more difficult for you to sell shares of our common stock at times and prices that you feel appropriate." (12/9/11 Rabin Decl., Ex. B. at p.28)

### B. The Parties Contractually Agreed That Money Damages Will Not Adequately Compensate Cranshire For Any Loss Incurred By Reason of ACTI's Breach of the Warrants.

ACTI attempts to avoid the effect of its admission in § 5(k) of the Warrants that money damages will not adequately compensate Cranshire for any loss resulting from ACTI's breach, by asserting that a contractual provision cannot confer a right to an injunction. (ACTI Br. at 13)

Cranshire's position is that this contractual provision "might arguably be viewed as an admission by [defendant] that plaintiff will suffer irreparable harm" if there is a breach. *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2nd Cir. 1999). Even the case law ACTI cites at p.13 of its brief supports Cranshire's position that a contractual provision such as § 5(k) is "one factor to be considered in determining whether irreparable harm will result if injunction does not issue[.]" *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 99 U.S.P.Q.2d 1785 (S.D.N.Y. 2011).

### C. Because ACTI Is In A Perilous Financial State, ACTI Is Unlikely To Be Able To Satisfy Any Ultimate Damage Award.

ACTI asks the Court to reject the findings of Judges Crotty and Engelmayer that there is a substantial risk that ACTI will be unable to satisfy a money judgment, and find that ACTI will be able to pay any money judgment. (ACTI Br., at 12). This argument conflicts directly with

---

[8] This figure is derived by dividing the total amount of shares that are to be issued under the proposed settlement by the total number of shares outstanding. ACTI's December 12, 2011 8-K states that the proposed settlement will result in the issuance of 240.5 million shares (ACTI Br. at 1); ACTI's brief states that it has a total of 1,705,673,605 shares outstanding and held by shareholders. (*Id.* at 13).

admissions of ACTI's CEO, which show that ACTI's financial state is extremely perilous. ACTI's CEO, Gary Rabin, concedes that ACTI loses "approximately $3 million on an operating cash basis per quarter" and "has not yet generated material revenues or profits, has a negative net worth and relies upon periodic infusions of equity for its operating cash needs...." (12/9/11 Rabin Decl. ¶¶ 10-11) Indeed, in its most recent publicly-filed financial statements on November 9, 2011, ACTI had a negative net worth of over $54.8 million with a deficit of almost $242 million. (ACTI 10-Q (12/1/11 M. Kopin Decl., Ex. M)). Rabin further states that ACTI's "statutorily required risk disclosures in its filings with the SEC fairly warn investors that [ACTI's] business is risky and uncertain." (12/9/11 Rabin Decl. ¶¶ 10-11) The risk disclosures span *18 pages* of ACTI's most-recent 10-K. (12/9/11 Rabin Decl., Ex. B, at pp.19-38)

Equally unavailing is ACTI's assertion that "a risk" of insolvency is insufficient to meet the required showing of irreparable harm. However, ACTI's response brief at p.11 concedes that to show irreparable harm, the movant must show that "***a risk*** of insolvency" is "likely or imminent". The risk of insolvency can be shown when defendant is in a perilous financial state, which is precisely the financial condition of ACTI. *See Centauri Shipping Ltd. v. Western Bulk Carriers KS*, 528 F. Supp. 2d 186, 194 (S.D.N.Y. 2007) (irreparable harm can be found "where the party that might ultimately be ordered to pay the monetary damages is insolvent or facing imminent bankruptcy, *or is in a perilous financial state*.") (Emphasis added.)

### III. The Balance Of Hardships Clearly Weighs In Favor Of Cranshire.

In its response brief, ACTI does not address the balance of hardships, which tips decidedly in Cranshire's favor. (Cranshire Br. at 17-18)

### IV. Cranshire Should Not Be Required To Post A Bond.

Finally, ACTI urges this Court to impose a bond because it argues that if the PI issues it will trigger a "chain reaction" of suits that will deplete ACTI's authorized shares. (ACTI Br. at

9

17) This argument is belied by the actual course of events. Although Alpha Capital sued in September 2011, (a) only three other suits ensued (Black Mountain, CAMOFI Funds, and Cranshire); and (b) ACTI apparently has settled with most -- if not all -- other potential claimants. (ACTI Br. at 1, 9) Furthermore, as Judge Engelmayer found, "ACTI's current predicament appears to have been exacerbated by its own response to the recent events", *i.e.*, ACTI's failure to take action to increase the number of its authorized shares. (Cohen Decl., Ex. 3, Hearing Tr. at 33)

## CONCLUSION

For the foregoing reasons, plaintiff Cranshire Capital Master Fund, Ltd. respectfully urges this Honorable Court to grant its motion under Fed. R. Civ. P. 65 for a preliminary injunction ordering defendant Advanced Cell Technology, Inc. to immediately deliver 18,662,107 shares of its common stock to Cranshire.

December 13, 2011

By: _____
Philip H. Cohen
**GREENBERG TRAURIG LLP**
200 Park Avenue
New York, N.Y. 10166
(212) 801-9200
cohenp@gtlaw.com

Scott Mendeloff (*pro hac* application pending)
Gabriel Aizenberg (*pro hac* application pending)
**GREENBERG TRAURIG LLP**
77 West Wacker Drive, Suite 3100
Chicago, IL 60601

10